**SPALDING, DIVISION OF QUESTOR CORPORATION, Plaintiff,**

**v.**

**Anthony J. ANTONIOUS and Ajac Glove Corporation, Defendants.**

**Civ. No. 73–321–H.**

United States District Court,
D. Maryland.

June 18, 1975.

---

Bertram S. Halberstadt and Connolly, Bove & Lodge, Wilmington, Del., and Donald R. Bahr, Toledo, Ohio, for plaintiff.

G. Franklin Rothwell, Washington, D. C., for defendants.

ALEXANDER HARVEY, II, District Judge:

In this civil action, the plaintiff is seeking a declaratory judgment concerning the scope and validity of a patent for a golf glove. On June 29, 1971, United States Patent No. 3,588,917 (hereinafter Antonious '917) was issued to the defendant, Anthony J. Antonious, who is the President and principal stockholder of the co-defendant, Ajac Glove Corporation.[1] The plaintiff Spalding is a division of Questor Corporation and manufactures and sells sporting goods equipment, including golf gloves.

It is alleged in the complaint that Antonious '917 fails to meet the standards of §§ 102, 103 and 112 of Title 35, U.S. Code, and that the patent is invalid because the applicant committed fraud on the Patent Office in procuring it. Spalding here seeks a declaration that Antonious '917 is invalid and unenforceable, a declaration that golf gloves manufactured by Spalding do not infringe this patent, and appropriate injunctive and other relief. The defendants have answered the complaint and have filed a counterclaim in which they seek an adjudication that Antonious '917 is valid and infringed, an accounting, compensatory damages and other related relief.[2]

Presently before the Court is plaintiff's motion for summary judgment,

---

1. The complaint alleges that Ajac Glove Corporation has a beneficial interest in the patent and conducts or will conduct a business under the protection of the patent.

2. Defendants have demanded a jury trial under Rule 38, F.R.Civ.P.

which was filed after extensive discovery by the parties. The sole question raised in the pending motion is whether the patent in suit is invalid under 35 U. S.C. § 102(b) because the invention claimed was on sale in the United States more than one year prior to the date that the application for the patent was filed. Relying on depositions, exhibits and affidavits that have been filed herein, plaintiff claims that there is no genuine issue as to any material fact insofar as its contention under § 102(b) is concerned, and that it is therefore entitled to summary judgment under Rule 56, F.R.Civ.P. Briefs have been filed by the parties, and a hearing on the motion has been held in open court.

Golf gloves are intended to provide players of this ancient and honorable game with a better grip on the shaft of the club and are further designed to avoid blistering or chafing of the hand. The sale and use of golf gloves has become widespread since World War II, and competition among sporting goods companies has been keen in recent years. In its business of manufacturing, distributing and selling a large variety of sporting goods equipment and accessories, plaintiff Spalding makes golf gloves at its manufacturing facility in Spain. Such gloves are imported into this country and sold throughout the United States.

Defendant Antonious filed the application for the patent in question on July 9, 1969. He operates Ajac Glove Corporation from his personal residence in Ellicott City, Maryland, and although he has sold some golf gloves which were an embodiment of the patent in suit, he and his corporation have not been able to market this product successfully in recent years.

Intended to provide a taut fit on the palm and fingers, Antonious '917 differs from conventional golf gloves in the structure and position of the Velcro or similar fastener across a deep vent opening on the back of the glove. Velcro is an adjustable fastening device and is used in this invention, together with a deep vent opening and dual elastic, to insure that the glove will fit snugly yet permit the wearer's hand to be easily inserted and removed. Spalding has successfully manufactured and sold a similar product known as its "Elite" glove, which defendants contend infringes Claim 1 of Antonious '917.

Before this action was filed in this Court, the defendants had brought a proceeding against Spalding and others before the United States International Trade Commission (formerly the United States Tariff Commission) under 19 U. S.C. § 1337, claiming unfair methods of competition and unfair acts by Spalding in importing into the United States golf gloves which allegedly infringed Antonious '917. In that proceeding, defendants sought an exclusion order prohibiting the entry into the United States of Spalding gloves manufactured in Spain. Following an investigation and various public hearings, the Commission on March 13, 1975 filed a Report, in which it found no unfair methods of competition or unfair acts by Spalding, concluded that there was no violation of § 1337 and recommended that the President not issue an exclusion order forbidding entry into the United States of the golf gloves in question. *In the matter of an investigation with regard to the importation and domestic sale of certain golf gloves,* Docket No. 337–37, United States International Trade Commission (ITC Publication 720, Report of March 13, 1975).[3] Plaintiff also relies on the Commission's findings in that proceeding in support of its motion for summary judgment.

---

**3.** The written report was filed by the Commission after argument had been heard in this case. At the request of the Court, the parties later filed supplementary briefs, discussing the effect of the Commission's findings and conclusions, if any, on the question presented by the pending motion for summary judgment.

The single issue presented by the pending motion has been further narrowed by a stipulation entered into between the parties. Leonard Cecil is and has been since 1965 a self-employed manufacturer and seller of golf gloves. His deposition was taken in this case on May 16, 1974. It has been agreed that several gloves designed by Cecil and manufactured in Spain for him in 1966 and 1967 read on Claim 1 of Antonious '917.[4] In view of this stipulation, there is no dispute that there was a like invention in existence more than one year prior to the date of the application filed by the defendant Antonious for the patent in suit. The sole question presented then is whether Cecil's gloves were "on sale" in the United States more than one year before July 9, 1969, within the meaning of 35 U.S.C. § 102(b).

## I

This Court is aware of the rule that summary judgment should be employed with great caution in patent cases. *Morpul, Inc. v. Glen Raven Knitting Mill, Inc.*, 357 F.2d 732, 736 (4th Cir. 1966). Nevertheless, summary judgment under Rule 56 is clearly applicable in a patent case when there is no genuine issue as to a material fact. *Morpul, Inc. v. Glen Raven Knitting Mill, Inc., supra; Smith v. General Foundry Mach. Co.*, 174 F.2d 147 (4th Cir.), *cert. denied* 338 U.S. 869, 70 S.Ct. 144, 94 L.Ed. 533 (1949). Where the matter at issue is not unduly technical and where no issue of fact is presented, courts have readily granted motions for summary judgment in patent cases. *See, Smith, supra* (tobacco barn); *Park-In Theatres v. Perkins*, 190 F.2d 137 (9th Cir. 1951) (drive-in theatre); *Samuel J. Miller & Co. v. A. Schreter & Sons Co.*, 246 F.Supp. 737 (D.Md.1965), *aff'd per curiam* 374 F.2d 510 (4th Cir. 1967) (button-down tie), and *Friedlander v. Union*, 150 F.Supp. 849 (D.Md.

1957) (chair construction). The language in *Samuel J. Miller & Co., supra* at 741, is particularly pertinent:

> The Courts are properly reluctant to grant motions for summary judgment in patent cases where the particular patent uses terms of art which must be translated into lay language, or the prior art patents and publications require expert testimony to explain them to the Court * * * [Here] the terms used in the patents and publications are popular and non-technical, and the principles involved are simple.

A similar case is presented here. The terms used by the deposition witnesses and the language of Claim 1 itself are readily understandable without requiring that they be translated into lay language by an expert witness. Moreover, the critical factual question is whether the Cecil gloves were "on sale" during the time in question, not whether they embodied an invention. Thus, the ground of invalidity asserted here does not touch on any area of inquiry considered previously by the Patent Office. *Atlas Chemical Industries, Inc. v. Moraine Products*, 509 F.2d 1, 3 (6th Cir. 1974).

## II

35 U.S.C. § 102 provides in pertinent part as follows:

> A person shall be entitled to a patent unless
>
> * * * * * *
>
> (b) the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States,

This statute invalidates a patent if either of two different sets of circumstances exist. If during the period specified the invention either was in public use or was on sale in the United States,

---

4. The gloves in question are Nos. 1–4 of plaintiff's Exhibit No. 24.

the patent is invalid under § 102(b). *Nicholson v. Carl W. Mullis Engineering and Mfg. Co.*, 315 F.2d 532, 535 (4th Cir. 1963). The sole inquiry in this case concerns the "on sale" aspect of the statute.

In *Nicholson*, the Fourth Circuit sustained the District Court's finding that the machine in question had been put on sale before the critical date established by § 102(b). Noting the authorities holding that "sale" means not simply a contract of sale but a delivery and acceptance of the article if it is one to be thereafter constructed, the Court found that the invention in that case had been reduced to practice and proven to have been completed several months before sales had actually been made. 315 F.2d at 535.

In *Chromalloy American Corp. v. Alloy Surfaces Co.*, 339 F.Supp. 859, 869 (D.Del.1972), the Court observed that an invention offered for sale before the statutory cut-off date is on sale within the meaning of § 102(b) even though no actual sale has occurred. The Court said (at 869):

> This is true even when (a) but one offer has been made to but one customer; (b) the prices are only estimated rather than established; (c) no commercial production runs have been made; and (d) the alleged invention is never sold.

The *Chromalloy* case states the rule which has been recognized in various jurisdictions. *See, Smith & Griggs Mfg. Co. v. Sprague*, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141 (1887); *Atlas Chemical Industries, Inc. v. Moraine Products, supra* at 4; *Minnesota Mining & Mfg. Co. v. Kent Industries, Inc.*, 274 F.Supp. 993, 999 (E.D.Mich.1967), *aff'd* 409 F. 2d 99 (6th Cir. 1969); *Philco Corp. v. Admiral Corp.*, 199 F.Supp. 797, 814, 816–817 (D.Del.1961); *Chicopee Mfg. Corp. v. Columbus Fiber Mills Co.*, 165 F.Supp. 307, 325 (M.D.Ga.1958); *Wende v. Horine*, 225 F. 501, 505 (7th Cir. 1915).

Relying on *F. E. Myers & Bro. Co. v. Goulds Pumps*, 91 F.Supp. 475, 497 (W.D.N.Y.1950), defendants argue that before Cecil's gloves could be considered to be "on sale" within the meaning of the statute, he must have had an inventory of golf gloves on hand ready for delivery. But that case imposed such a requirement only where a specimen of an invention or a raw prototype is involved. There is no such limitation for completed products such as the Cecil gloves. *F. E. Myers* was one of the cases noted by the Fourth Circuit in the to be thereafter constructed." 315 F.2d *Nicholson* case when the Court observed that the "delivery and acceptance" limitation applies only if the article "is one at 535.

The facts in *Connecticut Paper Products, Inc. v. New York Paper Co.*, 39 F. Supp. 127 (D.Md.1941), *aff'd in part, rev'd in part on other grounds*, 127 F.2d 423 (4th Cir. 1942), which is also relied upon by defendants, were likewise quite different from those here. There was no evidence in that case that the dispenser had been fabricated before the critical date. Only an imperfect model had been prepared, and the Court declined to invoke the bar of § 102(b) because the goods in question were not in fact on hand ready for delivery before the cut-off date. 39 F.Supp. at 133.

### III

In support of its motion for summary judgment, plaintiff has filed herein a number of depositions, together with the exhibits which were identified and discussed in such depositions. In opposing the motion, defendants have filed no depositions but rely on affidavits of defendant Antonious, an affidavit of counsel and certain exhibits. The facts established by this record are set forth hereinafter.

In the years 1965 and 1966, Leonard Cecil, working in his own garage, developed a new design for a golf glove. Cecil had previous patent experience in

other fields and decided to go into the golf glove business in the years in question. The gloves he developed, as shown in Items 1 through 4 of Plaintiff's Exhibit No. 24, concededly contain all the elements recited in Claim 1 of Antonious '917.

In the fall of 1966, Cecil arranged for the Asem glove factory in Spain to make 25 to 30 dozen of the gloves in question. Thereafter, Cecil offered these gloves for sale to various major companies in the golf equipment business. Cecil's efforts in attempting to sell his gloves to the Acushnet Company, to the Professional Golf Company and to several other similar companies were unsuccessful. Although Cecil never was able to sell his gloves in quantity to major companies, he testified that he did sell in excess of 25 dozen gloves directly to individuals and club golf shops.

During late 1966 and early 1967, Cecil gave some of his gloves to Deane Beman, who was then an outstanding amateur golfer.[5] Later, Cecil and Beman entered into a business relationship, whereby Beman agreed to put Cecil in contact with major golf glove manufacturers and help him promote the sale of Cecil's gloves. Eventually, the efforts of Cecil and Beman to sell the gloves in quantities to major manufacturers did not materialize, and their business relationship ended in April 1967.

The testimony of Cecil and Beman concerning their efforts to market these golf gloves in the winter of 1966–1967 is corroborated by the exhibits and by the deposition testimony of various representatives of the Acushnet Company, of the Professional Golf Company and of other companies. These individuals testified that Cecil and Beman during the winter in question tried to sell Cecil's golf gloves to their respective companies. The gloves offered for sale at this time were one or more of those shown in plaintiff's Exhibit No. 24, which, it has been stipulated, read on the patent in suit.

The evidence indicates that Acushnet did not buy from Cecil and Beman at this time because its own models were doing very well. The Professional Golf Company did place an order for samples of the Cecil glove but decided not to market the glove during this period because it would be poor timing to introduce a new glove in the spring of 1967 and because of certain pricing problems.

■■ The uncontradicted deposition testimony of all of these witnesses, together with the supporting exhibits, establish quite clearly that the invention in question was on sale more than one year before the date of the application filed by the defendant Antonious for the patent in suit. The critical date is July 9, 1968, and the sales activity in question occurred in late 1966 and early 1967. Cecil's invention was not an experimental prototype but, as was the case in *Nicholson, supra,* had been reduced to practice and 25–30 dozen gloves had actually been manufactured several months before the sales activity occurred. The quantities involved and the selling efforts undertaken by Cecil and his business associate were more than sufficient to establish that the invention was "on sale" in this country before the critical date within the meaning of § 102(b).[6]

■ In opposing summary judgment, defendants first contend that the credibility of the deposition witnesses in question is suspect and that defendants should be permitted to present the issue of credibility to a jury at the trial.

---

5. Beman was at one time the national amateur champion and became a professional in April 1967. When his deposition was taken, he was employed by the Professional Golfers Association of America, concededly a responsible position in professional golf.

6. There is also testimony in this record that actual sales were made by Cecil to individuals and to club golf shops. Plaintiff has not relied on this testimony in claiming that it is entitled to summary judgment.

However, a party may not, under Rule 56, proceed to trial on the mere hope that he will be able to discredit movants' evidence, but must in opposing a motion for summary judgment be able to indicate to the Court the existence of a triable issue of material fact. 6 J. Moore, *Federal Practice*, ¶ 56.15[4] at 2372. When a motion for summary judgment has been made and supported as it has in this case, the adverse party in his response by affidavits or otherwise must set forth "specific facts" showing that there is a genuine issue for trial. Rule 56(e).[7]

In *Rinieri v. Scanlon*, 254 F.Supp. 469 (S.D.N.Y.1966), the Court, in granting a motion for summary judgment, reviewed a number of decisions concerning the effect to be given to the credibility of deposition witnesses and said the following (at 474):

All these cases support the proposition, applicable here, that the party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party *in some material portion*, and that the opposing party may not merely recite the incantation, "Credibility," and have a trial on the hope that a jury may disbelieve factually uncontested proof. (Emphasis supplied).

To the same effect are *Radio City Music Hall Corp. v. United States*, 135 F.2d 715 (2d Cir. 1943) and *Dyer v. MacDougall*, 201 F.2d 265 (2d Cir. 1952). See also Wright & Miller, *Federal Practice & Procedure*, § 2726 at 521 (1973). In a case such as this one in which the testimony of plaintiff's deposition witnesses so conclusively establishes the fact in issue, the defendants cannot be permitted to go to trial just

on the hope that in the more formal atmosphere of the courtroom the witnesses will revise their testimony or that a clever trial tactic will produce helpful evidence. *Johns Hopkins University v. Hutton*, 297 F.Supp. 1165, 1199 (D.Md. 1968), affirmed in part and reversed in part on other grounds, 422 F.2d 1124 (4th Cir. 1970).

In this case, counsel for defendants was present at the taking of the depositions of both Cecil and Beman and cross-examined both witnesses. Although defendants' counsel was not present at the taking of the depositions of the other witnesses, proper notice of these other depositions had been given, and defendants' attorney could have attended these depositions as well, had he chosen to do so.[8]

 Defendants assert that their attorney did not attend many of the depositions taken by plaintiff because plaintiff had indicated at one point prior to trial that it did not intend to file a motion for summary judgment. Following a preliminary conference with the Court, plaintiff filed a formal statement on May 13, 1974, indicating that plaintiff had decided not to file a motion for summary judgment "at this time." Later, at the pretrial conference held on November 8, 1974, plaintiff's attorney specifically requested that a trial date not be set and that plaintiff be permitted to file a motion for summary judgment based on 35 U.S.C. § 102(b). A number of additional depositions had by that time been taken by plaintiff, including that of Leonard Cecil, and plaintiff urged that it be permitted to present to the Court before trial the single narrow issue raised by the pleadings under § 102(b). The Court took such request under advisement. After reviewing the

7. Defendant Antonious concedes that most of the events related by the deposition witnesses are outside his knowledge.

8. Although represented at the depositions of the witnesses Cecil and Beman, defendants did not have counsel present at the depositions of the witnesses Miller, Cassell, Oehmig and Thompson. Proper notice of the taking of all these depositions had been given to counsel for defendants.

additional depositions which had been filed, the Court subsequently granted the request and by letter to counsel dated November 25, 1974, set a schedule for briefing and arguing plaintiff's motion for summary judgment.[9]

The hearing on the pending motion for summary judgment was not held until February 21, 1975. Thus, there was ample time for defendants to schedule any further necessary depositions so as to be able to bring to the Court's attention specific facts showing that there was a genuine issue for trial. At the very least, defendants could have reconvened the depositions of those witnesses who had not been cross-examined by their attorney. *See Batchelor v. Legg & Co.,* 52 F.R.D. 553, 561 (D.Md.1971). At the hearing on the motion, the Court granted defendants' request to be permitted to file an additional affidavit.[10] No similar request was made by defendants for permission to further examine witnesses whose deposition testimony plaintiff was relying on.

In any event, an attorney representing defendants was present at the depositions of the witnesses Cecil and Beman, and both of these individuals were cross-examined. These were concededly the most important witnesses relied upon by plaintiff, and their testimony alone, as supported by the exhibits in evidence, establishes that the Cecil gloves were on sale before the critical date.

■ Defendants also contend that one seeking to sell a product must have more than just a few samples in his possession before he can satisfy the "on sale" requirements of § 102(b). But 25 to 30 dozen gloves represent many more than a few samples. Production by the Asem factory in Spain in such quantities shows that Cecil had the capability of producing his gloves in large quantities had he obtained orders from the major companies. In any event, the authorities cited hereinabove do not require that any particular quantities of the product in question must be offered for sale in order to satisfy the "on sale" requirements of § 102(b). The quantities of gloves involved here were clearly sufficient.

■ Other arguments pressed by defendants are likewise without merit. It is claimed that there is not sufficient documentary proof to support the oral deposition testimony relied upon by plaintiff. But there are numerous exhibits which are a part of the record in this case and which support the witnesses' testimony. The fact that a stronger case might have been made if more invoices or other documents had been produced does not defeat the motion in view of this Court's finding that the totality of the evidence in the record is sufficient to satisfy the requirements of Rule 56. It is also claimed that the record here does not establish that the gloves offered for sale by Cecil in 1966 and 1967 were precisely the same as those subject to the stipulation, which are Items 1 to 4 of Plaintiff's Exhibit No. 24. But several witnesses testified that the gloves put on sale in 1966 and 1967 were "identical" to those shown in the Exhibit. The evidence is more than sufficient in this respect.

In view of this Court's determination of the question presented by the pending motion for summary judgment, it is not necessary to decide whether the findings made by the United States International Trade Commission in the previously mentioned administrative proceedings should have any effect in this case as collateral estoppel or otherwise. The decision reached herein was made on the

---

9. The motion and supporting brief were to be filed by December 31, 1974. The opposition with brief was to be filed by January 31, 1975, with a reply brief due February 7, 1975.

10. A "Rebuttal Affidavit" was filed by defendant Antonious on March 3, 1975.

basis of the record presently before the Court. It should be noted, however, that with a similar record before it, including many of the same depositions that were filed here, the Commission concluded that for the purposes of 19 U.S.C. § 1337, the patent in suit had no validity because the Cecil gloves were offered for sale in the United States more than one year before the date of the patent application. *See Report of March 13, 1975, supra* at pages 5, 6 and 22.

IV

For the reasons stated, plaintiff's motion for summary judgment is granted. Counsel should prepare and submit an appropriate Order.